IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SOUTHERN COAL CORPORATION, ) ) Plaintiff, ) v. ) ) DRUMMOND COAL SALES, INC., ) ) Defendant. ) | CIVIL ACTION FILE<br><br>NO._____ |

## COMPLAINT

Plaintiff, Southern Coal Corporation ("Southern Coal"), for its Complaint against the defendant, Drummond Coal Sales, Inc. ("DCS"), alleges and states:

**I.     NATURE OF THE ACTION**

1.   This is an action by Southern Coal for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 with respect to a Bulk Coal Transfer and Storage Agreement dated October 3, 2013 (the "Agreement") between Southern Coal and DCS.  Southern Coal has discovered that it was the victim of deliberate over-billing and misrepresentations by DCS that were designed  to appear as if the Agreement was being observed when DCS knew it was not. Upon Southern Coal becoming aware of DCS's scheme, Southern Coal requested adequate assurances that the over-billing practice stop, but  DCS insists that it has the continued right to

- 1 -

unilaterally impose price increases not found in the Agreement. Due to DCS's repudiation and material breaches of the Agreement, the Agreement is no longer enforceable. A copy of the Agreement is attached as Exhibit 1.

## II.   PARTIES, JURISDICTION AND VENUE

2.   Southern Coal is a Delaware corporation with its principal place of business in Roanoke, Virginia.

3.   DCS is, upon information and belief, an Alabama corporation with its principal place of business in Vestavia Hills, Alabama.  DCS may be served care of its registered agent, William B. Long, 1000 Urban Center Drive, Suite 300, Birmingham, Alabama 35242.

4.   This Court has subject matter jurisdiction over this action because it is between citizens and residents of different states and because the amount in controversy, excluding interest and costs, exceeds the sum of $75,000.  28 U.S.C. § 1332.

5.   Southern Coal brings this declaratory judgment action pursuant to 28 U.S.C. §§ 2201 and 2202.  An actual controversy within the meaning of §2201 exists between Southern Coal and DCS regarding the Agreement.

6.   Venue is proper in this Court because Section 20.7 of the Agreement sets forth that:

> This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to the principals [sic] of conflicts of laws thereof. Each party hereby consents to submit to the exclusive jurisdiction of the United States District Court, Northern District of Georgia, Atlanta Division, for any action, suit or proceeding arising out of or relating to this Agreement (and agrees not to commence any action, suit or proceeding relating thereto except in such courts). Each party waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the United States District Court, Northern District of Georgia, Atlanta Division, and further waives and agrees not to plead or claim in any such court that such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

**III.   THE CONTROVERSY**

7.   The Agreement entails certain service work that DCS would perform regarding coal that Southern Coal would ship into the Pier IX terminal owned by Kinder Morgan and located in Newport News, Virginia. DCS has certain contractual rights with Kinder Morgan regarding the Pier IX terminal that permit DCS to perform the service work required by the Agreement.

8.   Pursuant to Section 2.2 of the Agreement, a minimum requirement of 2,000,000 tons was set for the amount of coal to be annually transferred by Southern Coal at Pier IX.

9.   In return for the services provided by DCS for the coal transferred by Southern Coal, the Agreement provided that DCS would be paid a "Throughput Fee" of "$6.00 per net ton, plus any increases in the Throughput Fee pursuant to

Section 6.14." [Agreement at Section 6.1] Essentially, the "Throughput Fee" represented a minimum monthly contract price of one million dollars per month while the Agreement was in force.

    10.    The referenced Section 6.14 of the Agreement provides as follows:

> Charges and Fee Adjustment: Beginning on January 1, 2014 and on the first day of each subsequent calendar quarter during the Term, all charges and fees contained in this Agreement shall be increased by the change in the Peak Downs metallurgical benchmark price (Benchmark). (Except other charges in sections 6.8 and 6.12 which shall be escalated per section 6.13). The Benchmark shall be stated in $ per metric ton and the base amount shall be $145.00 per MT (CY Q3 Benchmark). Any determination pursuant to this Section shall not be applied if the resulting change would be below the rates or charges as set forth herein. For clarity, all rates or changes (other than Sections 6.8 and 6.12) as set forth in this Agreement will only be adjusted upward as a result of an increase in the Benchmark. An example for illustrative purposes of the first Throughput Fee quarterly adjustment beginning January 1, 2014: CY Q4 Benchmark $140 per metric ton; no adjustment to be made. CY Q4 Benchmark $150 per metric ton; 150/145 x $6.00 per net ton = $6.21 per net ton effective January 1, 2014.

    11.    Until October, 2016, there was no effort to increase the Throughput Fee.

    12.    In addition, at some time prior to October, 2016, the Benchmark mandated for use by the Agreement ceased to be published.

    13.    DCS did not suggest that it and Southern Coal negotiate any amendment to the Agreement to replace the Benchmark with some other formula.

14. Although the Benchmark ceased to exist, in a DCS invoice dated October 25, 2016 issued to Southern Coal, DCS set forth in part: "Throughput Fee = Q4, **2016 Benchmark** $200.00/$145.00 X $6.00 = $8.28". (Emphasis added.) A copy of this invoice is attached as Exhibit 2. Consequently, DCS billed Southern Coal in the amount of $1,380,000 as the minimum payment due versus the minimum payment of $1,000,000 based on the Agreement's $6.00 per ton requirement.

15. DSC's invoice specifically utilized the word "Benchmark" with a capital "B" intending to reference Section 6.14 of the Agreement as if DCS was following the Agreement's language, even though DCS knew that it was not utilizing the Benchmark set forth in the Agreement since the Benchmark no longer existed.

16. On November 2nd, 2016 and again on December 1st, 2016, DCS issued two more invoices similarly increasing the Throughput Fee as if the Agreement's Benchmark had increased the Throughput Fee amount due from $1,000,000 to $1,380,000, when in fact the Benchmark had ceased to exist.

17. The accounts payable department of Southern Coal paid the referenced invoices believing that DCS had properly billed under the Agreement and not knowing that the DCS referenced "Benchmark" did not exist.

18. DCS knew or reasonably should have known that Southern Coal was mistaken in paying the referenced invoices. DSC's own invoices expressly referenced the "Benchmark," a defined term in the Agreement, suggesting the invoices were deliberately drafted to mislead Southern Coal into believing the Benchmark still existed.

19. Then, on January 3, 2017, DCS issued a new invoice numbered 42100433 that set forth the following: "Throughput Fee = Q1, 2017 Benchmark $285.00/$145.00 X $6.00 = $11.78". DSC's invoice sought payment of $1,965,000, or nearly double the amount of $1,000,000 based on the Agreement's former 6.00 fee. A copy of this invoice is attached as Exhibit 3.

20. When DCS issued its January, 2017 invoice, it knew that the Agreement's Benchmark did not exist.

21. Due to this enormous increase in the January invoice, Southern Coal began a thorough review of the appropriateness of DCS's invoicing practices.

22. Upon recognizing that DCS was issuing invoices in excessive amounts that had not been agreed to in the Agreement, Southern Coal immediately requested that the billing practices be stopped. Among other things, Southern Coal wrote DCS a letter that is attached as Exhibit 4.

23. DCS responded to Southern Coal's letter by letter dated March 20, 2017 that is attached as Exhibit 5.

24. DSC's letter (Exhibit 5) is, among other things, an express repudiation of the Agreement and, among other things, wrongly asserts that Southern Coal must accept DSC's unilateral price increases, even though these increases are not set forth in the Agreement and have not been the subject of any agreed-to written amendment of the Agreement.

25. As earlier set forth, the Agreement is governed by the substantive law of the State of New York. [Agreement, Section 20.7]

26. The Agreement requires that it may not be amended, altered or changed except by a writing that is executed by both DCS and Southern Coal. [Agreement, Section 20.22] No such amendment has been made and, instead, DCS purports to unilaterally rewrite the Agreement by redefining "Benchmark."

27. In addition, the New York Statute of Frauds requires that any change to the Agreement be in a writing signed by both parties. DCS and Southern Coal have not entered a written amendment to the Agreement.

28. DSC's letter (Exhibit 5) also wrongly asserts that the service Agreement is governed by the New York Uniform Commercial Code, yet the Code is not applicable since the Agreement is for services, not the sale of goods, and in

fact it expressly disclaims that a sale of coal is involved in the Agreement. (See, *e.g.*, Section 2.1 of the Agreement setting forth "services" and Section 3.1 of the Agreement setting forth that no sale of coal is involved.)

## Count One

29. Southern Coal realleges and incorporates herein paragraphs 1-28 of this Complaint.

30. The parties expressly agreed on a mandatory and exclusive method for determining price: ". . . all charges and fees contained in this Agreement shall be increased by the change in the Peak Downs metallurgical benchmark price (Benchmark)." (Section 6.14 of the Agreement.)

31. The Agreement provided no alternative method for calculating increases in charges in the "Benchmark" specified in Section 6.14 of the Agreement in the event the Benchmark ceased to exist.

32. In Section 6.13 of the Agreement -- the one immediately preceding the Section that defines "Benchmark" (6.14) -- the parties agreed that other, unrelated charges would be tied to a particular published tariff but only "to the extent available." No such leeway is found in Section 6.14 that would excuse the mandatory application of the Benchmark referenced in that Section 6.14.

33. The parties did not manifest an intention that Southern Coal should pay an adjusted price in the absence of the mandatory Benchmark set forth in Section 6.14 of the Agreement.

34. DCS has deliberately sought to alter the Agreement without even requesting -- let alone obtaining -- the written consent of Southern Coal.

35. The actions of DCS inclusive of unilaterally redefining "Benchmark" without seeking written amendment of the Agreement; overbilling based on its unilaterally and ex-contractually redefined "Benchmark";  and misleading Southern Coal into believing that the Agreement's mandatory and exclusive Benchmark continued to exist and that DCS was billing according to it  each constitutes and taken together constitutes an express repudiation of the Agreement, which repudiation is a quintessential material breach of the parties' Agreement that DCS has announced (in Exhibit 5) it will not retract.

36. By creating and transmitting the deceptive invoices (that could have but one purpose – to mislead), DCS breached its duty of good faith and fair dealing owed to Southern Coal.

37. Based upon DSC's actions, Southern Coal is authorized to treat the Agreement as terminated and does so.  Southern Coal requests that the Court

declare that Southern Coal's obligations under the Agreement are discharged as of October 25, 2016.

38. Because the Benchmark has ceased to exist, the pricing term of the Agreement cannot be determined in the only manner the Agreement allowed, and the Agreement has become unenforceable.

## Count Two

39. Southern Coal realleges and incorporates herein paragraphs 1-38 of this Complaint.

40. DCS's letter (Exhibit 5) asserts a right to unilaterally change the Agreement and to implement that change.

41. DCS's assertion is in and of itself a breach of the Agreement.

42. DCS's letter (Exhibit 5) claims that the New York Uniform Commercial Code permits a party to unilaterally change price terms.

43. Not only is the UCC inapplicable to the substantive law governing the Agreement, but also, even if the UCC were applicable, there is no right to unilaterally increase prices as is asserted in DCS's letter.

44. The DCS letter (Exhibit 5) is at most an offer to negotiate a new agreement which has not been accepted by Southern Coal.

45.     What DCS proposes in Exhibit 5 letter is not commercially reasonable, as it is not related to any commercially reasonable increase in DSC's costs, if any, in performing any service in Norfolk, Virginia.

46.     Based on the foregoing, Southern Coal requests that the Court declare that, contrary to DCS's letter, there has been no new agreement between the parties as to price.

## Prayer for Relief

WHEREFORE, Southern Coal prays that this Honorable Court:

A.     Enter a declaratory judgment that the Bulk Coal Transfer and Storage Agreement is no longer enforceable and ceased to be in effect as of October 25, 2016 when DCS sent its first false invoice;

B.     Award Southern Coal its damages that reasonably flow from the declaratory judgment;

C.     If required, issue injunctive relief enjoining defendants, its officers, agents and employees from otherwise seeking to enforce the Bulk Coal Transfer and Storage Agreement;

D.     Grant such other and further relief as may be proper; and,

E.     Award Southern Coal its attorneys' fees and costs as permitted by Section 10.1 of the Agreement.

>Respectfully submitted,
>
>CHILIVIS, COCHRAN, LARKINS & BEVER, LLP
>
>By: *s/ John K. Larkins, Jr.*
>John K. Larkins, Jr.
>Georgia Bar No. 438425
>3127 Maple Drive, NE
>Atlanta, Georgia  30305
>(404) 233-4171 (telephone)
>(404) 261-2842 (facsimile)
>jkl@cclblaw.com

Of Counsel:

Jon Hogue
jhogue@mhandl.com
Timothy Murray
tmurray@mhandl.com
Murray, Hogue & Lannis
3400 Gulf Tower
Pittsburgh, PA 15219
Phone: (412) 263-5650
Fax: (412) 263-5660

>*Attorneys for Plaintiff Southern Coal Corporation*