## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| SOUTHERN COAL CORPORATION, | |
| Plaintiff, | |
| v. | CIVIL ACTION FILE NO. 1:17-CV-01104-WMR |
| DRUMMOND COAL SALES, INC., | |
| Defendant. | |

## ORDER

Plaintiff Southern Coal Corporation ("Southern Coal") filed this action against Defendant Drummond Coal Sales, Inc. ("Drummond") following a dispute over pricing under a contract to transfer and store coal. Southern Coal seeks a declaratory judgment and a judgment for breach of contract [Doc. 1], and Drummond asserts counterclaims against Southern Coal and its President, James C. Justice II, for declaratory judgment, breach of contract, and breach of a corresponding guarantee [Doc. 40]. The matter is now before the Court on the parties' respective motions for summary judgment [Doc. 66, Doc. 72], as well as Drummond's Motion to Strike [Doc. 67] and Southern Coal's Motion in Limine and

1

to Strike Report [Doc. 88].  Upon consideration of the arguments presented by the parties and all appropriate matters of record, the Court finds and rules as follows.

## I.   <u>BACKGROUND</u>

On October 3, 2013, Southern Coal and Drummond entered into a four-year Bulk Coal Transfer and Storage Agreement ("Agreement"). [Doc. 40 ¶ 7; Doc. 72-2 at p. 2 ¶4].  In exchange for the services provided by Drummond under the Agreement, Southern Coal agreed to transfer through Drummond's facility a minimum of 2,000,000 metric tons of coal per year and pay Drummond a "minimum monthly Throughput Fee of $1,000,000." [Doc. 40 ¶ 8; Doc. 72-3 at p. 3 Section 2.2 and pp. 8-9 Section 6.1].  The Agreement provides that the base amount for the Throughput Fee would be adjusted upward based on increases in the "Peak Downs metallurgical benchmark price" (the "Benchmark"). [Doc. 72-3 at p. 11 Section 6.14].  At the time the contract was executed, an Australian company named BHP Billiton was typically responsible for setting the Benchmark, which was the published quarterly price of high-quality metallurgical coal mined at BHP's Peak Downs mine in Australia and sold to Japanese steel manufacturers. [Doc. 72-2 at p. 5 ¶ 15; Doc. 66-2 at p. 7 ¶10].  The parties agreed that the Agreement would be governed by and construed in accordance with the laws of the State of New York. [Doc. 72-3 at p. 20 Section 20.7].

Contemporaneous with the execution of the Agreement, James Justice executed a Guarantee, which provided that he "unconditionally and irrevocably guarantees to [Drummond] the prompt and complete payment and performance by [Southern Coal] when due of all obligations of [Southern Coal] under the Agreement (the "Obligations")….All payment or payments made by [Southern Coal] or…by virtue of any action or proceeding or any set-off or appropriation or application, at any time or from time to time, in reduction of or in payment of the Obligations shall be deemed to reduce the liability of the Guarantor hereunder, which shall…remain liable for the remaining unpaid balance of the Obligations…" [Doc.66-6 at p. 2 Section 2].

During the first several months of the Agreement, the Throughput Fees invoiced by Drummond prices were calculated with the use of the Benchmark. [Doc. 72-2 at p. 6, ¶¶ 16-19; Doc. 66-2 at pp. 18-19, ¶¶ 35-37].  Southern Coal paid the invoices dated prior to October 25, 2016. [Doc. 72-2 at p. 7 ¶20; Doc. 66-2 at p. 19 ¶ 37].

Sometime before the fourth quarter of 2016, BHP Billiton moved away from quarterly pricing, which resulted in the published quarterly benchmark for premium quality coking coal being set by other Australian coal producers. [Doc. 66-7 at pp. 6-8 ¶¶ 11-14; Doc. 89-1 at p. 10 ¶ 21].  The evidence shows that the entire coal industry agreed on one quarterly benchmark figure for each quarter.  Although

market participants and coal industry publications referred to the agreed upon quarterly price using various terms such as the "Peak Downs benchmark," the "Australian coking coal benchmark," or simply "the benchmark," there is some evidence to show that it was understood in the coal industry that the various terms denoted the same thing: the market price for premium quality, low volatile coking coal from Queensland's Bowen Basin sold to Asian steel manufacturers. [Doc. 66-7 at pp. 7-8 ¶ 13].  A number of coal industry publications, including Doyle Trading Consultants, published this quarterly benchmark. [Doc. 40 at p. 8 ¶24].

In the fourth quarter of 2016, the quarterly benchmark price for metallurgical coal – as published by Doyle Trading Consultants and other industry publications – increased from $145.00 to $200.00 per metric ton.  Drummond considered this price increase to trigger Section 6.14 of the Agreement.  Accordingly, Drummond sent Southern Coal an invoice on October 25, 2016, for $1,380,000, which included a $380,000 increase in the monthly Throughput Fee. [Doc. 66-2 at pp. 23-24 ¶¶ 49-50].  Southern Coal paid the October invoice in two installments, $1,000,000 on November 4, 2016, and $380,000 on November 28, 2016.  Drummond sent Southern Coal invoices in November 2016 and December 2016 that included the same Throughput Fee increase.  Southern Coal paid the November invoice in two installments, $1,000,000 on December 5, 2016, and $380,000 on December 15,

2016, and it paid the December invoice in full on January 6, 2017. [Doc. 72-2 at pp. 8-11 ¶¶ 25-39; Doc. 72-25 at pp. 8-10 ¶ 14].

In the first quarter of 2017, the market price for metallurgical coal – as published by Doyle Trading Consultants and other industry publications – increased to $285.00 per metric ton.  Accordingly, Drummond sent Southern Coal an invoice on January 3, 2017, for $1,965,000, which included a $965,000 increase in the monthly Throughput Fee.  Southern Coal paid $1,000,000 of the invoice on February 6, 2017, but it refused to pay the remaining $965,000. [Doc. 66-2 at p. 24 ¶¶ 51-53; Doc. 72-25 at pp. 8-10 ¶ 14].

Since the payment of the January 2017 invoice, Southern Coal has refused to pay the minimum $1 million Throughput Fee as well as any increase to the Throughput Fee. [Id.]

Contending that the "Peak Downs" benchmark, as it was constituted at the time of the Agreement, has ceased to exist and that there is no longer a mechanism for price adjustments under the Agreement, Southern Coal sent a letter to Drummond on March 9, 2017, demanding adequate assurances that Drummond would not charge any increase to the Throughput Fee and would only charge the minimum $1 million. [Doc. 1-4 at pp. 2-3].  Southern Coal also stated in the letter that it would pay a lower amount for the March 2017 and April 2017 invoices to account for its

5

overpayment on the November, December, and January invoices. [Id.]  Drummond

sent a reply letter to Southern Coal asserting its right to increase the Throughput Fee

by essentially the same benchmark (i.e., the quarterly price for metallurgical coal

mined in Australia and shipped to Japanese steelmakers), and that Southern Coal had

no right to withhold payments on either the March or April invoices. [Doc. 1-5 at

pp. 2-3].

## II.    LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears

the initial burden of "informing the court of the basis for its motion and of identifying

those materials that demonstrate the absence of a genuine issue of material fact."

*Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 840 (11th Cir. 2000) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Those materials may include

"depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

"Only when that burden has been met does the burden shift to the non-moving party

to demonstrate that there is indeed a material issue of fact that precludes summary

judgment."  *Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991).

6

The non-moving party is then required "to go beyond the pleadings" and present competent evidence "showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 252 (1986). If in response the non-moving party does not sufficiently support an essential element of his case as to which he bears the burden of proof, summary judgment is appropriate. *Rice-Lamar*, 232 F.3d at 840. "In determining whether genuine issues of material fact exist, [the Court] resolve[s] all ambiguities and draw[s] all justifiable inferences in favor of the non-moving party." *Id*. (citing *Anderson*, 477 U.S. at 255).

In deciding a summary judgment motion, the court's function is not to resolve issues of material fact, but rather to determine whether there are any such issues to be tried. *Anderson*, 477 U.S. at 251. The applicable substantive law will identify those facts that are material. *Id*. at 248. Facts that are disputed, but which do not affect the outcome of the case, are not material and thus will not preclude the entry of summary judgment. *Id*. Genuine disputes are those in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. For factual issues to be "genuine," they must have a real basis in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). When the record

as a whole could not lead a rational trier of fact to find for the non-movant, there is no "genuine issue for trial." *Id*. at 587.

## III.   **DISCUSSION**

### A. Section 6.14 of the Agreement

The Court's consideration of the parties' respective motions for summary judgment primarily involves on the interpretation and enforceability of Section 6.14 of the Agreement.  Specifically, Section 6.14 provides that "all charges and fees contained in this Agreement shall be increased by the change in the *Peak Downs metallurgical benchmark price* (Benchmark)." (emphasis supplied).   The Agreement, however, does not define the term "Peak Downs metallurgical benchmark price," and a thorough reading of the Agreement as a whole does not provide any insight into the parties' intent regarding the meaning of this term.

Under New York law, "[i]n determining the obligations of parties to a contract, courts will first look to the express contract language used to give effect to the intention of the parties, and where the language of a contract is clear and unambiguous, the court will construe and discern that intent from the document itself as a matter of law." *Williams v. Village of Endicott*, 91 A.D.3d 1160, 1161-62, 936 N.Y.S.2d 759 (2012); *Shook v. Blue Stores Corp.*, 30 A.D.3d 811, 812, 817 N.Y.S.2d 190 [2006].  Whether a contract is ambiguous is a question of law to be resolved by

the court. *W.W.W. Assoc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990); *Stevens & Thompson Paper Co., Inc. v. Niagara Mohawk Power Corp.*, 49 A.D.3d 1011, 1012, 853 N.Y.S.2d 423 [2008].

"A contract is ambiguous if the language used lacks a definite and precise meaning, and there is a reasonable basis for a difference of opinion." *Pozament Corp. v. AES Westover, LLC*, 27 A.D.3d 1000, 1001, 812 N.Y.S.2d 154 (2006) (citations omitted). If the provision in controversy is reasonably or fairly susceptible to different interpretations or may have two different meanings, the contract is ambiguous. *New York City Off-Track Betting Corp. v. Safe Factory Outlet, Inc.*, 28 A.D.3d 175, 177, 809 N.Y.S.2d 70 (2006). In the context of a specialized trade or business contract, such as the one at issue here, contract terms are considered ambiguous if they are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997) (citation omitted). "Where language used is susceptible to differing interpretations and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words becomes an issue of fact and summary judgment is inappropriate." *Id.*; *Seiden Assocs. v. ANC Holdings*, 959 F.2d 425, 428 (2d Cir.1992).

9

Here, when the Agreement is read as a whole to determine its purpose and intent, the Court finds that there is an ambiguity regarding the meaning of the term "Peak Downs metallurgical benchmark price," as both parties have offered reasonable interpretations of the term. Southern Coal has presented facts to show that the "Peak Downs metallurgical benchmark price" was the published quarterly price of metallurgical coal mined at BHP Billiton's Peak Downs mine and shipped to Japanese steel manufacturers. [Doc. 40 at p. 22 ¶ 78; Doc. 89-1 at p. 7 ¶ 15]. Drummond, on the other hand, has presented evidence to show that, at the time the parties executed the Agreement, the term "Peak Downs benchmark price" was universally understood by the coking coal industry to mean the quarterly market price for premium low volatile coking coal from Queensland's Bowen Basin sold to Asian steel manufacturers. [Doc. 66-7 at p. 8 ¶ 14].

As there is an ambiguity in Section 6.14 of the Agreement which cannot be resolved by the rules of contract construction, the Court concludes that there is a genuine issue of material fact as to the parties' respective claims for declaratory judgment and breach of contract arising out of the invoicing and non-payment of the increases in the monthly Throughput Fee under Section 6.14 of the Agreement.

## B.      Section 6.1 of the Agreement

Pursuant to Section 6.1 of the Agreement, Southern Coal is required to pay Drummond a "minimum monthly Throughput Fee of $1,000,000." [Doc. 72-3 at pp. 8-9 Section 6.1 and p. 17 Section 15]. The issue of whether Section 6.14 is ambiguous or unenforceable has no bearing on the validity and enforceability of Section 6.1, as the Agreement contains a "Savings Clause," which provides that

> [i]f any section, subsection, paragraph, or provision of this Agreement shall be declared invalid by any court of competent jurisdiction, then such a judicial determination shall not affect the remaining section, subsections, paragraphs, or provisions of this Agreement, and each such other section, subsection, paragraph, or provision shall remain in full force and effect. [Doc. 72-3 at p. 21 Section 23].

Where a contract provision is invalid or unenforceable and there is a savings clause in the contract, New York courts have consistently held that the appropriate remedy is to sever the improper provision rather than void the entire agreement. See *Christian v. Christian*, 42 N.Y.2d 63, 73, 365 N.E.2d 849, 396 N.Y.S.2d 817 (1977) (agreement which included a legally unenforceable provision and a severability clause was enforceable as to the remaining provisions); *Seabury Const. Corp. v. Dist. Council of New York & Vicinity of United Brotherhood of Carpenters & Joiners of Am.*, 461 F. Supp. 2d 193, 200 (S.D.N.Y. 2006) (holding that, "even if the renewal clause were to be found defective, that clause is severable from the Agreement pursuant to [the] savings clause and general principles of contract law . . . . The

11

renewal clause does not render the contract void, even if [the plaintiff's] interpretation were accepted").

Southern Coal has not challenged the validity of Section 6.1 of the Agreement, specifically.  However, Southern Coal contends that it was entitled to terminate the entire Agreement and no longer perform its obligations because Drummond had materially breached the Agreement by acting in bad faith in exercising its duty to invoice properly and by failing to provide Southern Coal with adequate assurances that it could perform under the Agreement.  Southern Coal's contentions are without merit.

Drummond's duty to invoice is set forth in Section 15 of the Agreement, which provides that "[Drummond] shall calculate any true-up payment due from [Southern Coal] for the calendar month just ended and shall render such invoices as appropriate." [Doc. 72-3 at p. 17 Section 15]. The fact that Southern Coal may not agree with the amount that Drummond invoiced does not mean that Drummond breached its duty to invoice as required under Section 15 of the Agreement.

Furthermore, to support a claim of anticipatory repudiation of a contract under New York law, there must be evidence of "an unqualified and clear refusal to perform with respect to the entire contract" from one party "by advancing an untenable interpretation of the contract, or [by] communicat[ing] its intent to

perform only upon the satisfaction of extracontractual conditions[.]" *O'Connor v. Sleasman*, 37 A.D.3d 954, 956, 830 N.Y.S.2d 377 (2007) (internal quotation marks and citations omitted). *C.f. IBM Credit Fin. Corp. v. Mazda Motor Mfg. (USA) Corp.*, 92 N.Y.2d 989, 992-993 (1998) (holding IBM's "insistence on an untenable interpretation of a key contractual provision, and refusal to perform otherwise, constituted an anticipatory breach of the contract."). Here, however, Southern Coal cannot show that Drummond at any time refused to perform the key provisions of the contract—namely to perform the throughput services.

Lastly, Southern Coal contends that it was entitled to terminate the Agreement because Drummond failed to respond to its demand for adequate assurances. This argument fails because the doctrine of adequate assurance applies only to contracts for the sale of goods under New York law. *See Bank of N.Y. v. River Terrace Assocs., LLC*, 23 A.D.3d 308, 309, 804 N.Y.S.2d 728, 729 (2005) (plaintiff had no right to demand adequate assurance because "[t]he longterm construction loan agreement at issue is not analogous to a sales contract"). The Agreement is a services contract, and, therefore, the doctrine of adequate assurance simply does not apply. *See Abernathy-Thomas Engineering Co. v. Pall Corp.*, 103 F. Supp. 2d 582, 610 (E.D.N.Y. 2000) (contract which provided for the storage of the defendant's nuclear filters at the plaintiff's facilities "is not one for the sale of goods as defined in the U.C.C., but rather a services contract").

Even if the doctrine applied, Southern Coal could not have reasonably believed that Drummond would not perform; therefore, Southern Coal had no right to demand adequate assurance. *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 465-66, 705 N.E.2d 656, 660-61 (1998) ("The right to demand adequate assurance only vests where 'reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach under § 243'") (citation omitted).

Assuming arguendo that the doctrine does apply, and further assuming that Southern Coal had the right to demand adequate assurance, Drummond provided assurance that it would perform its obligations under the Agreement.  In particular, on March 9, 2017, Southern Coal demanded "adequate assurances that the fees charged by Drummond under the Agreement will only be as set forth in the Agreement and without any adjustment except for as specifically set forth in the Agreement." [Doc. 1-4 at p. 2].  In response, Drummond pointed out that "adequate assurance has no application in the present situation," but further stated that its "performance obligation is to provide Southern with the throughput services, and there is no question regarding Drummond's ability to provide those services." [Doc. 1-5 at p. 3].

As the evidence is undisputed that Southern Coal has failed or refused to pay the minimum monthly Throughput Fee since the payment of the January 2017

14

invoice [Doc. 66-2 at p. 24 ¶¶ 51-53; Doc. 72-25 at pp. 8-10 ¶ 14], and for the above reasons, summary judgment in favor of Drummond is appropriate with respect to Southern Coal's liability for the minimum Throughput Fee of $1,000,000 per month as set forth in Section 6.1 of the Agreement.

## C.    The Guarantee

The undisputed evidence shows that James Justice, Southern Coal's president, executed a Guarantee of Southern Coal's obligations under the Agreement.[1] [Doc. 66-1].  The Guarantee is "continuing, absolute and unconditional" and expressly waives Justice's right to argue that the Agreement is unenforceable or otherwise assert defenses available to Southern Coal.  The Guarantee provides, in pertinent part, that:

> This Guarantee shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to (a) the validity or enforceability of the Agreement or any other instrument or document relating to the Obligations, any of the Obligations or any collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by DCS, (b) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by the Company against DCS, or (c) any other circumstance whatsoever (with or without notice to or knowledge of the Company or the Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of the Company for the Obligations, or of the Guarantor under this Guarantee, in bankruptcy. [Doc. 66-6 at p. 3 ¶ 5].

---

[1]  The Guarantee is governed by New York law. [Doc. 66-6 at p. 5 ¶ 12].

Put more simply, the provisions of the Guarantee "effectively provide[ ] that, even if [Southern Coal] is able to escape liability, the guarantee is still enforceable." *Hyman v. Golio*, 134 A.D.3d 992, 993, 24 N.Y.S.3d 84 (N.Y. App. Div. 2015).

To warrant summary judgment, Drummond must "submit[] proof of the underlying agreement, the Guaranty, [Southern Coal]'s failure to make payments under the underlying agreement, and [Governor Justice]'s failure to perform under the Guaranty." *Jet Acceptance Corp. v. Quest Mexicana, S.A. de C.V.*, 28 Misc. 3d 1204(A), 957 N.Y.S.2d 636 (Sup. Ct. 2010), *aff'd,* 87 A.D.3d 850, 929 N.Y.S.2d 206 (2011).  Here, the undisputed evidence shows that the above elements have been satisfied in this case.

Based on the foregoing, James Justice is personally liable for all amounts payable to Drummond under the Agreement, including the minimum monthly Throughput Fees of $1,000,000 as set forth in Section 6.1, as well as any increases to the Throughput Fees that may be appropriate after the trier of fact addresses the ambiguity and determines the enforceability of Section 6.14 of the Agreement. Accordingly, the Court finds that summary judgment in favor of Drummond is appropriate with respect to James Justice's liability under the Guarantee, with the amount of damages to be determined at the trial of this case.

### D.    Evidentiary Motions

In its Motion in Limine and To Strike the Report of Stephen Doyle [Doc. 88], Southern Coal argues that Doyle's expert opinion on the practices of the coal industry is irrelevant because the terms of the contract were unambiguous.  As this Court has found the contract's term "Peak Downs metallurgical benchmark price" to be ambiguous, making Doyle opinion relevant, the motion is denied.

Drummond filed a motion to strike the "rebuttal response" of James Justice. [Doc. 67].  As the Court did not rely upon this report in the determination of the parties' motions for summary judgment, the motion is denied as moot.

## IV.    <u>CONCLUSION</u>

For all of the above reasons, IT IS HEREBY ORDERED that Southern Coal and James Justice's Motion for Summary Judgement [Doc. 72] is **DENIED** and that Drummond's Motion for Summary Judgment [Doc. 66] is **GRANTED IN PART and DENIED IN PART**. It is further ORDERED that Southern Coal's Motion in Limine and to Strike Report [Doc. 88] and Drummond's Motion to Strike [Doc. 67] are **DENIED**.

IT IS SO ORDERED, this 13th day of February, 2020.


WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE