# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| SOUTHERN COAL CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> DRUMMOND COAL SALES, INC., <br><br> Defendant/Counterclaim Plaintiff, <br><br> v. <br><br> SOUTHERN COAL CORPORATION and JAMES C. JUSTICE, II, <br><br> Counterclaim Defendants. | CIVIL ACTION FILE <br> NO. 1:17-cv-01104-WMR |

## FINAL ORDER AND JUDGMENT

The above matter having come before the Court for a bench trial on March 10-11, 2020, and after consideration of the evidence, argument of counsel, and all appropriate matters of record, the Court finds that Section 6.14 of the Agreement is unenforceable; that Drummond breached Section 20.2 of the Agreement; and, that Southern Coal breached Section 6.1 of the Agreement. For the reasons discussed below, the Court enters Judgment in favor of Drummond, and against Southern Coal and James C. Justice, II, in the amount of $6,860,000.

## I. PROCEDURAL BACKGROUND

Plaintiff Southern Coal Corporation ("Southern Coal") filed this action against Defendant Drummond Coal Sales, Inc. ("Drummond") following a dispute over pricing under a contract to transfer and store coal. Southern Coal asserted claims for a declaratory judgment and breach of contract [Doc. 1], and Drummond asserts counterclaims against Southern Coal and its President, James C. Justice II, for declaratory judgment, breach of contract, and breach of a corresponding guarantee [Doc. 40]. The Court has awarded summary judgment in favor of Drummond as to Southern Coal's liability for the minimum Throughput Fees under Section 6.1 of the parties' contract and as to James Justice's liability under the guarantee. [*See* Doc. 99]. Accordingly, the remaining issue at trial was the resolution of the ambiguity in Section 6.14 of the parties' contract, which is determinative of the parties' remaining claims.

## II. FINDINGS OF FACT

On October 3, 2013, Southern Coal and Drummond entered into a four-year Bulk Coal Transfer and Storage Agreement ("Agreement"). [Doc. 115 at p. 2 ¶ 5; *see also* Doc. 1-1]. The 4-year term of the Agreement commenced on January 1, 2014, and expired on December 31, 2017. [Doc. 1-1 at p. 3 Section 2.1]. In exchange for the services provided by Drummond under the Agreement, Southern Coal agreed

x

to transfer a minimum of 2,000,000 tons of coal per year through Drummond's facility and pay to Drummond a minimum monthly Throughput Fee of $1,000,000. [Doc. 115 at p. 3 ¶¶ 10-13; *see also* Doc. 1-1 at p. 3 Section 2.2 and pp. 8-9 Section 6.1]. The Agreement further provides that the base amount for the Throughput Fee would be adjusted upward based on increases in the "Peak Downs metallurgical benchmark price (Benchmark)." [Doc. 115 at p. 6 ¶ 21; Doc. 1-1 at p. 11 Section 6.14]. At the time the contract was executed, the "Peak Downs metallurgical benchmark price" was the published quarterly price of high-quality metallurgical coal that was mined at BHP Billiton's Peak Downs mine in Australia and sold to Japanese steel manufacturers. [Doc.121 – Trial transcript at p. 40:16-19; *see also* Doc. 72-2 at p. 5 ¶ 15; Doc. 66-2 at p. 7 ¶10].[1] The Agreement does not address what would occur if this "Benchmark" ceased to exist. The parties agreed, however, that the Agreement may not be amended, altered, or changed except by a writing that is executed by both Drummond and Southern Coal. [Doc. 1-1 at p. 20 Section 20.2].

During this litigation, the parties have each offered reasonable interpretations of the term "Peak Downs metallurgical benchmark price." [*See, for example,* Doc. 40 at p. 22 ¶ 78; Doc. 66-7 at p. 8 ¶ 14; Doc. 89-1 at p. 7 ¶ 15]. Although Drummond

---

[1] The base price of the Benchmark at the time of the contract was $145.00 per metric ton.

has presented evidence at trial to show that there has always been only one benchmark in the metallurgical coal industry and that there were a variety of terms used to describe this benchmark, including the "Peak Downs" benchmark [See Doc. 120 – Trial transcript at pp. 208-210, 219-220; Doc. 121 – Trial transcript at pp. 16-22, 133], the Court finds the following evidence to be more credible and persuasive.

Dennis Steul, Drummond's vice president of sales and the primary negotiator of the terms of the Agreement, testified that he always considered the term "Peak Downs" to be a specific reference to the mine owned by BHP Billiton.[2] [Doc. 121 – Trial transcript at p. 28]. Mr. Steul testified that premium low volatile coking coal from other mines, such as the North Goonyella mine, do not have the same characteristics as the premium low volatile coking coal from the Peak Downs mine. [Id. at pp. 131-132]. Mr. Steul further testified that Drummond had contracted in the past for coal prices based on the benchmark price for premium low volatile coking coal from another specific mine (i.e., Goonyella coal from the North Goonyella mine). [Id. at pp. 27-28, 131]. Mr. Steul testified further that, when dealing with someone who is not familiar with the benchmark being referenced, it

---

[2] It is undisputed that "Peak Downs" is a registered trademark of BM Alliance Coal (BHP Billiton). [Doc. 121 – Trial transcript at p. 56].

4

would be important to describe specifically the particular benchmark. [Id. at pp. 134-135].

Following the contract negotiations in this case, Drummond ultimately chose the "Peaks Downs metallurgical benchmark price" as the price escalator for the Throughput Fee. [Doc. 115 at pp. 3-6 ¶¶ 14-21; Doc. 121 – Trial transcript at p. 40:8-15]. Mr. Steul testified that, at the time of the contract, this "Benchmark" specifically referred to the quarterly price set by BHP Billiton for its coal that was mined from its Peak Downs mine and sold to Japanese steelmakers. [Doc. 121 – Trial transcript at p. 40:16-19 and p. 42:21-25 through p. 43:1]. At no time during the negotiations did the parties discuss any trade usage of the term "Peak Downs metallurgical benchmark" or discuss the possible use of alternative benchmarks. [Id. at pp. 43-45].

Based on the foregoing evidence, the Court finds that the term "Peaks Downs metallurgical benchmark price" was intended by the parties to be, specifically, the quarterly price set by BHP Billiton for its coal that was mined from its Peak Downs mine and sold to Japanese steelmakers.

During the first few months of the Agreement, the Throughput Fees invoiced by Drummond included upward adjustments based on the Peak Downs metallurgical benchmark price being above the base amount. [Doc. 115 at p. 6 ¶¶ 22-23; *see also*

Doc. 72-2 at p. 6 ¶¶ 16-19; Doc. 66-2 at pp. 18-19 ¶¶ 35-37]. However, from January 2014 through October 2016, the Throughput Fees invoiced by Drummond did not have any upward adjustments based on this "Benchmark," and the invoices during this period were billed at the agreed upon minimum amount of $1,000,000. All of these invoices were paid by Southern Coal. [Doc. 115 at p. 6 ¶ 24; *see also* Doc. 72-2 at p. 7 ¶20; Doc. 66-2 at p. 19 ¶ 37].

In 2014, BHP Billiton stopped offering quarterly pricing for the coal from its Peak Downs mine, which resulted in a quarterly benchmark for metallurgical coal being set by other Australian coal producers. [Doc. 121 – Trial transcript at pp. 12-13, 25]. A number of coal industry publications, including Platts Coal Trader and Doyle Trading Consultants, published this new quarterly benchmark. [Id. at pp. 17-18, 20-21].

In the fourth quarter of 2016, the quarterly benchmark price for metallurgical coal – as published by Doyle Trading Consultants and other industry publications – increased to $200.00 per metric ton. [Doc. 121 – Trial transcript at p. 20]. Although Drummond was aware that there was no longer a quarterly benchmark price based on "Peak Downs" coal, Drummond considered this new benchmark price, based on metallurgical coal from other mines, to trigger Section 6.14 of the Agreement. [Id. at pp. 12-13, 20-21; *see also* Doc. 72-19 at pp. 2-3]. Accordingly, in October,

November, and December of 2016, Drummond sent Southern Coal invoices (Invoice Nos. 42100418, 42100419, 42100424) which billed in advance for the months of January, February and March of 2017, respectively.[3]  These invoices were each in the amount of $1,380,000, which included a $380,000 increase in the monthly Throughput Fee for that quarter.  At trial, Mr. Steul acknowledged that these upward adjustments were based on "something totally different" than the Peak Down metallurgical benchmark price. [Doc. 121 – Trial transcript at p. 48:3-11].  At this point, Southern Coal was not aware that the Peak Downs metallurgical benchmark price had ceased to exist, and Drummond made no attempt to inform Southern Coal of that fact. [Doc. 120 – Trial transcript at pp. 72-76; Doc. 121 – Trial transcript at pp. 48-50].  Southern Coal paid these invoices in full. [Doc. 115 at p. 7 ¶¶ 27-28; *see also* Doc. 72-12, Doc. 72-15, and Doc 72-16].

In December 2016, the quarterly benchmark price for metallurgical coal – as published by Doyle Trading Consultants and other industry publications – increased to $285.00 per metric ton. [Doc. 121 – Trial transcript at pp. 21-22].  Accordingly, on January 3, 2017, Drummond sent Southern Coal an invoice (Invoice No. 42100433) which billed in advance for the month of April 2017.  This invoice was

---

[3] Section 15 of the Agreement required Southern Coal to pay each month's Throughput Fee to Drummond 60 days in advance.

in the amount of $1,965,000, which included a $965,000 increase in the monthly Throughput Fee for that quarter. [Doc. 72-17]. By this time, Southern Coal had discovered that the quarterly Peak Downs metallurgical benchmark price ceased to exist in 2014 and that there was no longer a mechanism to calculate any upward adjustments to the monthly Throughput Fee. [Doc. 120 – Trial transcript at pp. 74-77]. Accordingly, Southern Coal paid the $1,000,000 minimum base amount, but it refused to pay the upward adjustment of $965,000. [Doc. 115 at pp. 7-8 ¶ 29; Doc. 120 – Trial transcript at p. 137]. Southern Coal made no further payments to Drummond.

Although Southern Coal stopped paying the minimum $1 million Throughput Fee after it paid the January 2017 invoice for the month of April [Doc. 115 at p. 8 ¶ 30], Southern Coal continued to use Drummond's space to store and transfer its coal during the months of May and June of 2017. [Doc. 120 – Trial transcript at p. 137].

### III. <u>**CONCLUSIONS OF LAW**</u>

The Court concludes that Section 6.14 of the Agreement was rendered unenforceable in 2014 when the "Peak Downs" benchmark, as it was constituted at the time of the Agreement, ceased to exist and was no longer a mechanism for price

adjustments under the Agreement.[4] However, the Court concludes that the unenforceability of Section 6.14 had no effect on validity of the remainder of the Agreement. The Agreement contains a "Savings Clause," which provided that

> [i]f any section, subsection, paragraph, or provision of this Agreement shall be declared invalid by any court of competent jurisdiction, then such a judicial determination shall not affect the remaining section, subsections, paragraphs, or provisions of this Agreement, and each such other section, subsection, paragraph, or provision shall remain in full force and effect. [Doc. 72-3 at p. 21 Section 23].

Where a contract provision is invalid or unenforceable and there is a savings clause in the contract, New York courts have consistently held that the appropriate remedy is to sever the improper provision rather than void the entire agreement. See *Christian v. Christian*, 42 N.Y.2d 63, 73, 365 N.E.2d 849, 396 N.Y.S.2d 817 (1977) (agreement which included a legally unenforceable provision and a severability clause was enforceable as to the remaining provisions); *Seabury Const. Corp. v. Dist. Council of New York & Vicinity of United Brotherhood of Carpenters & Joiners of Am.*, 461 F. Supp. 2d 193, 200 (S.D.N.Y. 2006) (holding that "even if the renewal clause were to be found defective, that clause is severable from the Agreement pursuant to [the] savings clause and general principles of contract law . . . . The renewal clause does not render the contract void, even if [the plaintiff's]

---

[4] Section 20.7 of the Agreement provides that the Agreement shall be governed by and construed in accordance with the laws of the State of New York. [Doc. 1-1 at p. 20].

interpretation were accepted"); see also *Refinemet Int'l Co. v. Eastbourne N.V.*, 815 F. Supp. 738, 742 (S.D.N.Y. 1993), *aff'd,* 25 F.3d 105 (2d Cir. 1994) ("Under New York law, the measure of whether a contract's provisions are severable is a question of intent, determined from the language of the contract and the circumstances under which the contract was made").

The Court concludes that Drummond breached Section 20.2 of the Agreement when it unilaterally redefined the "Benchmark" without a written amendment executed by the parties and then billed Southern Coal based on the unilaterally redefined "Benchmark." The breach resulted in Southern Coal's overpayment of Throughput Fees in the total amount of $1,140,000 ($380,000 each month for the months of January, February, and March 2017). However, the Agreement was not repudiated because Drummond continued to perform its obligation to provide Southern Coal with throughput services and Southern Coal continued to utilize those services after the discovery of the breach. [Doc. 1-5; Doc. 120 – Trial transcript at p. 137]. Accordingly, the Court concludes that Southern Coal is entitled to credit for the fees it overpaid in the amount of $1,140,000.[5]

---

[5] The Court notes that Southern Coal would ordinarily be entitled to a refund for overpayment pursuant to Section 15 of the Agreement. [*See* Doc. 1-1 at p. 17 Section 15].

Based on the Court's award of summary judgment to Drummond in regard to Southern Coal's liability for the minimum monthly Throughput Fees set forth in Section 6.1 of the Agreement [*see* Doc. 40], as well as the evidence adduced at trial, the Court concludes that Southern Coal has breached Section 6.1 of the Agreement by failing to pay the minimum monthly Throughput Fee for the months of May through December 2017. Accordingly, Drummond has incurred $8,000,000 in damages as a result of said breach ($1,000,000 each month for the months of May through December 2017). As Southern Coal is entitled to the above credit in the amount of $1,140,000, the Court concludes that Drummond is entitled to recover $6,860,000 from Southern Coal as a result of said breach.[6]

Lastly, based on the Court's award of summary judgment to Drummond with regard to James Justice's liability under the guarantee [*see* Doc. 40], as well as the evidence adduced at trial, the Court concludes that James Justice is personally liable, jointly and severally, for the $6,860,000 and pre-judgment interest referenced above.

---

[6] The Court does not address the Defendant's claim for prejudgment interest in that the amount of this award is inconsistent with the amount which the Defendant invoiced the Plaintiff. If Defendant contends that it is nonetheless entitled to an award of interest, then Defendant should file a brief in regard to such claim within fifteen (15) days of the date of docketing of this Order. Plaintiff may file a response brief within fifteen (15) days of the filing of any brief by the Defendant. Defendant may also file a reply to the Plaintiff's response within seven (7) days of the filing of such response. If Defendant does not timely file a brief in support of its claim for interest, then such claim will be deemed abandoned and this judgment shall be final in all respects.

## IV. <u>**JUDGMENT**</u>

For all of the above reasons, IT IS HEREBY ORDERED that Drummond is entitled to JUDGMENT against Southern Coal and James C. Justice, II, jointly and severally, in the amount of $6,860,000.

IT IS SO ORDERED, this 27th day of April, 2020.

*William M. Ray II*
WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE